Good morning, your honors. Mayo Ashley in defense of defendant appellant Demetrius Warren. Your honors, the primary argument that I have here this morning is the way that the court and the parole officer imposed the four sentence for sense for point enhancement for for the Mr. Warren's participation in this particular case. The he was sentenced to 24 months plus at the top of the guideline range, which is the guideline range for the four level enhancement under 3D 1.1. The four point subparagraph A was was 97 months at the time, which is what the judge gave him. If if the offense level, even given even given the argument that perhaps he should have got a two point enhancement, even given that the offense level would have been 25 instead of 27 and you would have a 63 to 78 month range. That's a difference of 19 months. If you said, well, he shouldn't have any points, that the two point enhancement doesn't even count, then you're down to 51 to 63 months. And the point here with the two cases that the court has asked us to consider the Xerox case. That was where Xerox and his office manager apparently colluded. The district court said that she was I believe it was she was in it up to her ears. The. In the Xerox case, the court determined that she was not an unknowing facilitator, that she understood what was going on. Interesting enough, a Xerox guideline at 97 to 120 months, 121, I'm sorry. And he got 97, which is the bottom end. Mr. Warren got the top end. And in the ciphers case, the district court in the Lewis case, this court said that the district court had made no finding that the women that were involved even knew or suspected the scheme in effect. As the Bausch and Hyde, you've got some at least some proof in the record, correct? I'm sorry. As the Bausch and Hyde, you have some proof in the record that they knew they were involved, right? Right. Okay. And just come down to basically whether there's enough in your view with respect to Scott and Azure to justify the enhancement, correct?  Two of the women. You have to have five participants for this. And the girls, the four, if you will, straw buyers, all were charged. But two of those counts were dismissed, Your Honor. The one, I believe it was straw one, she moved, I'm sorry, he moved from California to Great Falls to live with her. And she bought the gun apparently for protection. The straw two also was involved with Mr. Warren. I think that perhaps the key here is, given Cipher's and Ciroc's, that the girls, even if they falsely signed the AFT form, they were not part of the conspiracy. They were not like the employees in Cipher's case where the employees even admitted to the grand jury that they knew what was going on. They knew they were taking false samples and that sort of thing. Counsel? Yes, ma'am. As to Bausch, she was told after she purchased the gun what he was going to do with it. And as to Hite, she was asked to get the guns back. They'd been seized by, I guess, the Nevada police. Now, does that then make them no in-participants? Well, I don't think she knew at the time that she purchased the guns. And there were a couple of the girls that were involved that, quite frankly, got upset with Mr. Warren's courting of other women and told the police. And I think that that at least gives some question as to their veracity or not. Well, if they later got disenchanted, that's not going to help them if they knew at the time what he was going to be doing with them. But it looks from the record to me that perhaps there's no evidence until after the fact that they learned about it. And is that adequate? That's correct. That's my impression, Your Honor. Yes. Well, my question is, knowledge after the fact, is that going to make them no in-participants? I don't believe so, Your Honor. No. That's my impression. I think what we've got here is, as I said in my brief, I had a similar case. And had the government given him a two-point enhancement, I might not even be here. But I had a client who had some people steal company checks. Had another person falsify those checks on a computer. Had still another person sign those checks or forge them, actually. And had several other people who hashed the checks. Now, that's my impression of what at least a four-point enhancement, maybe even a two-point enhancement, that's what it's intended to cover, is those kinds of crimes. The commission background note to 3B1.1 says that the adjustment upward should increase with both the size of the organization, which is arguably less than five, and the defendant's responsibility. Perhaps, argumentable, the defendant here did intend to get guns and sell them or whatever. He claimed he was a collector. But I don't think that that particularly applies, Your Honor, as an example of two-level enhancement. Two-level, not four. In Lopez-Salaez 254 Fed Appendix 621, the person contacted dealers, dispatched runners, set prices, negotiated amounts, made decisions regarding delivery and collected money. And in the Ding case, which is 282 Fed Appendix 511, the defendant was a CEO of a company, and all of the employers were conspirators. I think that distinguishes this case from the normal four-level. I'm arguing that it shouldn't, if anything, should have been a two-level. I'm not even convinced that the two-level enhancement was necessary in this case, Your Honor. Mr. Ashley, Ms. Ashley, what's your response to the, I think the government's primary contention is that, is in this sentence here on page 16 of the red brief, additionally, the four straw purchasers were criminally culpable participants as they were charged in separate indictments, as noted in the PSR. Why isn't that sufficient to make him, you know, an organizer, if they were criminally, you know, criminally culpable? Well, Judge Tashima, my argument there is that the two, the criminally charged all four girls, none of whom knew what was going on at the time. What do you mean? They knew they were making false statements, didn't they? They knew that they were buying the guns. They were using their names. They were buying it for him. They knew that. Well, why do you say they didn't know what was going on? Maybe they didn't know about the wider conspiracy, but they don't have to know about the conspiracy in order to be criminally culpable, do they? No, that's true, Your Honor. Well, if they're criminally culpable, then why can't Mr. Warren be charged as an organizer? Partially because the women purchased the guns apparently for self-protection. They didn't realize that Mr. Warren was getting the guns. I'm not even sure that he knew it at the time, Judge, that he was getting the guns to supposedly sell. I think that became a sort of a byproduct. Do they have to know that he was getting it to sell? No. Well, in other words, even without that knowledge, you know, they were criminally culpable, weren't they? Because they made false statements in purchasing the firearm in violation of 922 and 924, right? And my argument there, Judge, is that as so often happens in these cases, I think that there was an overcharge here, that the girls were charged so that they would appear to be criminally culpable. And when they finished the discovery, they were dismissed because they knew they couldn't prove those charges, Judge. Did they dismiss as to all four or as to two? Two, Your Honor. Two, Your Honor. Yes. Yeah. I'm out of time. Thank you. Thank you, Counsel. Just a second. Did you have another question? Yeah. Okay. Thank you. Ms. Stewart. Good morning. Paulette Stewart for the United States. To answer the question that you ended with, Defense Counsel, all the straw purchasers were indicted. All the straw purchasers admitted their roles, admitted that they lied on the forms, that, yes, there were relationships involved, there was gut, there was drugs that Mr. Warren enticed the straw purchasers with, there was money. They were all indicted. And that's just the four straw purchasers. Let's focus on the two, I think, that are at issue, probably Scott and Azure. Can you tell me exactly what the evidence and the record shows as to those two straw purchasers? Scott was actually in a relationship with Warren, and she actually bought a total of six firearms during the course of their relationship. She also went to California with Mr. Warren. And one of the things that she noted when she went to California with Mr. Warren was that he would go out and basically leave her in California and come back. And that is covered in the supplemental excerpts of record on page six. Where is the evidence as to those two that either of them was aware that the firearms were going to be used in a trafficking scheme? You know, I think that it's going to be, at least with Scott, it's going to be inferred with the trip to California. I don't think at the time that she made the false statements, we can say she knew absolutely that he was trafficking the guns. I think once she got to California is when she had a good idea as to what was going on, but she was not allowed to be privy to those contacts and to his conduct. Okay, so she didn't know, and it only takes, because it's a numerically based enhancement, it only takes one to be knocked out to destroy the enhancement. Let's assume for the moment that she didn't know that guns were going to be used in a trafficking scheme. Is that the end of it, or is, in fact, can you impose the enhancement without that knowledge? You know, I think we get there actually both ways. I think there are still five other people that he recruited, because he recruited everybody else that was involved with this. I mean, he, as the district court calls him, he's the brainchild. He was the one who actually ran this entire show. He's the one who recruited his cousin, who was a co-defendant. He was the one who recruited his then-girlfriend at that time, which was Evans. He's the one who recruited Azure, Hyatt, and Bosh. So, I mean, we're still at five, and he is basically, I guess, as the district court. Are you conceding or agreeing in response to Judge Thomas's question that if she didn't know about the conspiracy, then she can't be counted as one of the five? No, because she's still criminally culpable, Judge Teshima, which I guess was part of your question, is all of these participants and all of these people we're talking about were criminally culpable. It's in dismissed counts according to the plea agreement, but Warren was charged with aiding and abetting every single straw purchaser in these firearms transactions where these girls lied for him and purchased him firearms. Well, didn't this have to relate to the trafficking? The straw purchasers' straw purchases did relate to the trafficking, because one of the guns that was purchased by Ms. Scott did get trafficked in California. But she didn't know that that was going to happen. She did not absolutely know. That's not any different than what we'll call the hub-and-spoke conspiracy, right? In other words, each conspirator at the end of each of these spokes doesn't know anything about what's going on with the others. No, but he's the cog in that wheel. I mean, he's the center of that wheel that basically runs and turns the circle, that turns the cog. Yes, well, I think we all agree with that. But the question is, under the guidelines, what level of knowledge is required of these participants in order for them to be counted? Do they need to know the scheme or not? And I think you're saying that they don't. That's correct. And what's your best case that says that? Really, I guess one of the cases that I looked at was one of the cases you asked us to look at on Thursdays with ciphers, where it says that the court may look at the relevant conduct, look at the whole picture. And I think in this case, I think the sentencing court did that. He looked at the whole picture and said, if you step back and look at this whole picture, yeah, everybody knew what was going on and Warren was driving the whole machine. And therefore, the enhancement. I mean, to be fair, in the record, at least as to two, there's pretty minimal, if any, evidence that they were aware of the conspiracy, trafficking conspiracy. I mean, I think that's a fair statement of the record. And then the question for us is, is that important? Is that the end of the case or is it relevant at all that they didn't know everything? I don't think it's relevant that they knew everything. I don't think in a conspiracy every player has to have knowledge of what everybody else in the conspiracy is doing. But they have to have knowledge of the conspiracy, don't they? Yeah, they do have to have knowledge of what's, at least that something is out there. Yes, Your Honor. So you had, you counted, if we leave Scott out of it, you count Azure, Evans, and what's your best evidence on Azure? Azure was the purchaser of the rifle who he basically paid to purchase the 9mm rifle. He's the one who went and picked that out. He's the one who paid for it. She got to, of course, go fill out the form. And then when she went and actually picked up the firearm, he's the one who took it, already had ammunition for it. He was basically ready to go. And then, quite frankly, the only thing that stopped the investigation as to Mr. Warren's firearms trafficking that we're here on today was the fact that he committed a drive-by shooting and got arrested. I mean, so that's basically what stopped this whole thing. But, you know, I mean, this is a case where he's buying firearms at a place where it's easy to buy firearms, which is Montana. He's taking them down to the Oakland area. Well, there's no doubt about that and what he was doing and that he was a very bad guy. But the issue is what knowledge these women had to have to be involved as part of the conspiracy. Well, and then part of the conspiracy, too, or I guess not truly part of the conspiracy, but the facts of the case is Warren bragged openly that he could make so much money selling these firearms in California. I mean, he bragged openly to various witnesses in the case, and that's it, again, on page 6 of the supplemental excerpts of record. He was very brazen about it. He didn't keep this a secret. This wasn't, you know, don't tell anybody you're buying guns for me. Can we infer that these women then had knowledge of what he was up to? I think you can. It's a preponderance of the evidence. The court's record, the district court's record is reviewed for clear error. But, yes, I believe you can, Your Honor. And Judge Fadden didn't make any specific findings as to which people were involved that he was counting in this announcement, right? You know, he did not, and that's at tab 6. The sentencing transcript is at tab 6, page 7, is where he made his findings. He just says, The evidence is replete with confirmation the defendant was behind this idea for implementation of the conspiracy for which he stands. Right. He's a hands-on leader. He recruited others. It doesn't specify the number. He did not specify the number of players, no, Your Honor. Yeah. Okay. Any further questions? Thank you. We have an oral argument in hand. Thank you. Mr. Ashley, we'll give you a minute if you'd like to take it. I used my time, Your Honor. Okay. The court has additional questions. No questions. All right. Thank you very much. Thank you, both of you, for your arguments. The case history will be submitted. We'll proceed to the next case on the oral argument calendar, which is United States v. Williams. Mr. Ness? Thank you, Judge. My name is David Ness. I'm with the Federal Defenders, and I'm representing Mr. Charles Williams. Last week, shortly before argument, the court asked us to ask the parties to be ready to discuss a more recent decision from this case, and that is the McCaleb case. And so I guess I would just like to spend the bulk of my time discussing that case and what I think the differences are between the McCaleb case and Mr. Williams' case. It was not a helpful development for you, McCaleb. Well, you know, I thought that. But as I look at the cases, I think that there are some fairly significant differences here. Go ahead. In our case, you know, in the McCaleb case, it's sort of stereotypical what happens in these types of cases. That is where the jury was obviously confused over the verdict form, entered guilty verdicts on both the greater and lesser offenses. Here, of course, we have this kind of bizarre development where not only did the jury enter guilty verdicts on greater and lesser offenses, but actually wrote void across that portion of the verdict form dealing with the greater offense. The important thing, some of the important things that happened in Mr. Williams' case. What was the district court supposed to do at that point? Well, the logical thing is, well, tell us what you really meant. We can't understand the verdict, which is what Judge Haddon did. And that's what the judge in McCaleb did. The judge in McCaleb, you know, there's kind of the whole speech that he gave to the jury in the opinion, and he re-explained the procedure. He told the jury to go back and to deliberate and to come back with their decision. In Mr. Williams' case, what Judge Haddon did, and I think that this is a significant difference, is he didn't merely tell them to just go back and deliberate. He told them to go back and make a decision and come to a unanimous decision. And there are Supreme Court cases, and they were cited in the briefs, that talk about how when a judge affirmatively directs a jury to come to a decision, that that can be coercive. And what we have here is we don't know that. It's sort of an Allen charge, though. He just said come to a decision. I mean, you can't consider this to be a type of coercive Allen charge, can you? Well, I mean, he didn't jump on a juror and twist their arm or anything, but he did tell them that they... Judge Fletcher. Oh, I'm sorry. They could come out either way if you say go and make a decision. It could come out either way, but because we don't really know what was going on in the jury room, I mean, it could have very easily been that there could have been one or two holdouts on the greater offense. And that was why they decided to convict him of the lesser offense and write void across the greater offense. But then when the judge told the jurors to go back and not just deliberate, but to come to a decision and to come to a unanimous decision, that's where I think that the coercion came in. Of course, there was no objection, right? There was no objection, no. You know, they could have gone back and said, well, we've got to be unanimous, and there are two of you that won't go for the greater, so we've all got to go for the lesser included. That could have been in their mix of thinking. That could have been in their mix of thinking, but that's not what a jury necessarily has to do. I mean, if there's one or two of them that are holdouts, then that's a mistrial. They shouldn't change their vote just simply to come to an agreement with what may be the majority. One way of reading what came in was that they all agreed on the lesser charge. I would agree with that. That they all agreed on the lesser charge. So the judge is quite right to say, go back. I want you to clarify what your thinking is. What is your decision? Go back. But remember, it's not inconsistent for a jury to, I mean, all of them necessarily would have, could have, or I should say, those who found Mr. Williams guilty of the greater charge necessarily would have almost had to agree that he was also guilty of the lesser charge, because they're the same thing. So it's certainly possible, probable, and that's exactly what happened, is that they all agreed on the lesser charge. The question is, did they agree on the greater charge? And they came back and said, yes, we did. But that was after the judge essentially told them not just to go back and deliberate, not just to go back and reconsider, but to come back with their, you know, with a unanimous decision. And if you have the one or two back there that are saying, I don't think that he intended to distribute this methamphetamine, I believe Mr. Williams' testimony. We believe that Mr. Williams was buying this for personal use. And they're back there and the other jurors are saying, the judge says we have to come up with a unanimous decision here. I think that that's where the potential coercion comes in. So here's a sentence that you're, I guess you're relying on, and you conduct such deliberations as you deem appropriate to reach a unanimous verdict on the issues that you deem appropriate to answer based on your evaluation of the evidence? That's the primary sentence, yes. Together with, I think, the rest of what he's saying there. And the other thing, too, I think to keep in mind is when the jury first came in, now this would have been, I assume, it appears that way from the record, before Judge Haddon saw the verdict form, but he asked the jury on the two questions, is this your unanimous verdict? And the record shows that the jury said that, yes, it is. And he says, is this the verdict rendered by all 12 members of the jury? And, again, they said, yes, it is. Now that verdict form that was given had the void written across the front on the greater charge. And so I think the inference there is that there was a unanimous verdict on the lesser charge, but there wasn't a unanimous verdict on the greater charge, and that's exactly why they wrote void. But I know you weren't the trial counsel, but if you're sitting in trial counsel's shoes, you say, well, what's the harm of letting them go back? I think they're going to come back for the lesser included charge. If we adopt your argument, then it's basically allowing a sandbagging, no objection made at the time, you preserve the issue for appeal, and you win either way, right? I mean, that's the net result if you prevail in this argument. Certainly the court's fears. That's articulated in a number of the opinions. I think in defense counsel's behalf, though, this was a fairly strange development. You know, I think everybody was sitting there kind of scratching their heads. But I guess the question is that Mr. Williams is entitled to a unanimous verdict by an unbiased jury and a jury that has not been coerced. And I think that there are questions here on whether or not this jury was in fact coerced and whether or not there was true unanimity on this greater charge. Do you want to reserve some time? Thank you. Yes. Ms. French. Thank you, Your Honor. May it please the Court. Rebecca French, appearing for the United States in this case. And I guess I would just like to start at the point where I agree with defense counsel because I think that's always a good place to start. I believe that the defendant in this case was entitled to a unanimous verdict by a jury that was not coerced, and I think that's exactly what he got in this case. My one point of disagreement with defense counsel, and it's possible that I just missed this, but Mr. Ness said that there were cases in the brief cited on this issue of coercion, and I didn't see those cases. I didn't see that actually as an argument made by the defense counsel in the appellate brief, but certainly I'm happy to address that argument. I was also happy to see the decision, the recent decision by the Ninth Circuit in McCaleb, and I have to admit that my first reaction was, well, that disposes of the first issue. I don't need to worry about it. But on closer look, once again, I find myself in agreement with Mr. Ness. There is an important difference between what happened in McCaleb and what happened here in that while the verdict in McCaleb was arguably ambiguous, in this case I think there's no question that this was an ambiguous verdict in the sense that there was the word void written across the front, and I think that it is to Judge Haddon's credit, and I also was not actually present. It's ambiguous about void. Well, and I'll give that to you in the words of the judge. He said, well, members of the jury, I must ask you some questions in light of this form of the verdict. You have written the word void across the front page of the document, and I am unclear as to whether that is intended to apply to the entire verdict or whether that is intended to apply to the first page only. And then he first says, I am inclined to take a particular course of action here, please. But he's already asked them if they're unanimous in their verdict, and they say yes, and so they couldn't have, they obviously weren't intending a void for the whole. I mean, the most reasonable interpretation of it is that number one was not guilty. Well, that is perhaps what this court thinks. It wasn't apparently what Judge Haddon thought, and it's interesting because, as often happens, I find, between the time I briefed this case and the time I came here, I went back and looked at all of the cases, and I actually think of the cases I cited in this brief, the case that may be most clearly on point, which is United States v. Nelson, and that was a case where there was apparently an unanimous verdict. It involved 13 counts, charging someone with bank fraud, but during the polling of the jurors, one of the jurors said, you know, I can't say that that guilty verdict on counts one through three is right. And the judge in that case simply accepted the guilty verdict, I believe, on all counts. The United States conceded in that case that probably there wasn't intended to be a guilty verdict on counts one through three, but asked the court to say, but there was no disagreement about counts four through 13. And in that case, the court, looking specifically at Rule 31 and what the court is to do, when faced with this ambiguity, said the court has two choices. You can return the case for further deliberation by the jury, or you can simply discharge the jury. And I think that those were the choices that Judge Haddon was faced with in this case. It was not error for him, much less plain error, to do exactly what he did, which was allow the jury to go back, and I completely- May I interrupt you just for a second? I have a sort of procedural question, because I know we've discussed the fact there wasn't an objection, but in all fairness, it doesn't look like Judge Haddon gave the defendant or the prosecution any time to object. He just said, this is the way we're going to do it, and then sent the jury back, right? So he, I mean, normally, I shouldn't say normally, but most judges would say, let's discharge the jury, here's the verdict, counsel, here's what I'm going to do, do you have any objections, and then make the record. He just went ahead and discharged the jury with instructions, and then asked the counsel if he had any problems with that. In all fairness, I think that's pretty tough to say that they objected to the procedure after it occurred, or fault him for objecting to the procedure after it occurred. Well, but I think- And this goes to the standard of review. Well, and I think that he did give both counsel the opportunity to object at that point. You're right, it was- So what would be the point of the objection at that? Well, to preserve the issue for appeal, quite frankly, Your Honor. And they didn't even know what, in fact, he wasn't even sure whether the verdict form included the lesser included, the new verdict form. I think it was actually- Mr. Hoseley. Mr. Hoseley. And once again, I think that's to his credit that he wanted to make sure that he did, Your Honor. So I guess I don't have any fault with what the district court did in this case, or what really either counsel did in this case, certainly. And I don't think that there were no questions for previous counsel on the second issue, which is the sufficiency of the evidence. So I won't address that unless the court has any questions. Thank you. No further questions? No. Thank you, counsel. Mr. Nassarbuttle, you have a amendment at 18. Just very briefly, I think I misspoke when I was talking about the cases dealing with coercion. I was referring to Jenkins v. United States, and that's not cited in the party's briefs. That's cited in McCabe, and that's where they talk about the potential coercion. The more general type of coercion, I assume. Yes, that's correct. Thank you. But other than that, unless there's any questions, I have nothing further. Okay. Thank you both for your arguments. The case just heard will be submitted.
judges: Fletcher B. , Tashima, Thomas